122        SUPREME COURT OF WISCONSIN.        [105

Ashland Lime, Salt & Cement Co. and others vs. Shores.

ASHLAND LIME, SALT & CEMENT COMPANY and others, Respondents, vs. SHORES, imp., Appellant.

*November 25 — December 15, 1899.*

*Building contracts: Architects: Rejection of improper material or construction, when to be made: Patent defects: Waiver: Progress certificates, when subject to revision: Measure of damages.*

1. Where a building contract provides that a supervising architect representing the owner shall inspect the material and construction as operations progress, with power to reject any and all material and construction not deemed by him to conform to the contract, a failure to promptly reject any such material or construction for defects discoverable by the exercise of ordinary care, after a fair opportunity for exercising the duties of inspection, constitutes a waiver of such defects.

2. Where both parties to a building contract providing for payments to be made on progress certificates ignore such provision from the commencement to the end of operations, such provision will be deemed waived.

3. Where the progress certificates are limited by the contract to such portions of the building as have been constructed in a manner satisfactory to the supervising architect under the contract, they are not subject to revision at all, in the absence of some provision to that effect in the contract; and an accompanying provision to the effect that such certificate shall not be conclusive should be construed to extend only to defects that were not discoverable by the exercise of ordinary care prior to the giving of the progress certificate.

4. Where a building contract has been only substantially performed, the measure of damages recoverable by the proprietor is the reasonable cost of remedying such defects as are remediable without unreasonable expenditure, and the diminished value of the building when so completed from the value of a building constructed in all respects according to the contract.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge. *Affirmed.*

Action to enforce several subcontractors' liens upon a dwelling house and the grounds upon which it was situated. The controversy involved the validity of several of the lien

claims. The principal contract was between John H. Foster and Frank Houle as builders, and *Emma W. Shores* as owner. Houle sold out early to Foster, the latter assuming and agreeing to carry out all of the provisions of the contract upon the part of the builders. The principal contract price was $28,570, subject to additions and deductions on account of alterations that might be required and ordered by the supervising architect. The principal subcontract was with the Northern Manufacturing Company for the inside mill work of the building, the contract price for such work being $5,950, subject to additions and deductions as in the principal contract. Such subcontractor, before its work was done, made an assignment for the benefit of creditors to *A. E. Dixon*, who claimed to have completed the work. The amount claimed to be due on such subcontract was $2,904.76. There was a claim by the *Ashland Lime, Salt & Cement Company* for $149 for material furnished the principal contractors. Also a subcontractor's claim by *P. J. Dullanty* for $971.84, alleged to be due on a plumbing contract. There were several other claims, but those particularly mentioned were the subjects of the controversy. The pleadings on the part of the claimants did not set forth the terms of the principal contract, or the subcontract with the manufacturing company. Such company's pleading stated in general terms that it and *A. E. Dixon*, its assignee, furnished to the principal contractors at their request, work, labor, and material in the construction of the building and that the amount due therefor was $2,904.76. It admitted delay in performing the contract, but alleged that it was caused by the conduct of the principal contractors and their architect and was waived by them. It also alleged, without stating facts requiring an appraisal of the value of extras furnished by the subcontractor, that the supervising architect wilfully refused to appraise and value such extras as were furnished, or to submit the matter to arbitration. There were answers by

the principal contractor and the owner, setting forth the principal contract, the contract with the manufacturing company, and the contract with *Dullanty* for the plumbing. A breach of contract in each case was alleged, and there was a counterclaim for damages, those claimed against the manufacturing company and its assignee being $6,200, and against *Dullanty* $2,500. Replies were duly made to the counterclaims, alleging excuse for nonperformance of the manufacturing company's contract as to time and substantial performance of such contract in all other respects and of the other contracts mentioned. The principal contract required the building to be completed by the 1st day of July, 1898, and the subcontract with the manufacturing company provided for completion of the work covered by it by the 1st day of May, 1898. Each contract provided for the payment of $5 per day as liquidated damages for each day's delay not caused by certain specified circumstances, for which the architect was to make proper allowances subject to an appeal to arbitrators. The principal contract and the subcontract with the manufacturing company were identical as to all general provisions. Each contained the following stipulations: The work shall be performed under the direction and to the satisfaction of John W. Foster, acting as agent of the owner; the contractors shall, within twenty-four hours of receiving written notice from the architect to that effect, proceed to remove from the grounds or buildings all materials condemned by him, whether worked or unworked, or take down all portions of the work which the architect shall condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications, and to the conditions of this contract; the architect shall be permitted to inspect the work at all times during the progress of the building, and shall be provided with sufficient, safe, and proper facilities for that purpose by the contractors; in case the work is delayed by the fault of any other contractor, or

any alteration required, or damage by fire or unusual action
of the elements or otherwise, or abandonment of the work
by employees through no fault of the contractor, such con-
tractor shall be allowed additional time beyond the date set
for the completion of the work, such allowance to be made
upon a claim in writing made at the time of the obstruction
or delay, and the architect to certify the additional time to
be allowed, subject to an appeal from his award to arbitra-
tors; on the 1st day of each month as the work progresses,
a payment shall be made for eighty-five per cent. of the work
done during the preceding month, based on an estimate ap-
proved by the architect and certified by him that such work
has been done to his satisfaction; no certificate given or pay-
ment made, except a final certificate or final payment, shall
be conclusive evidence of the performance of the contract
either in whole or in part, and no payment shall be construed
to be in acceptance of defective work.

The cause was tried before a referee who made findings
of fact and conclusions of law covering all the issues. Such
findings, as to the matters controverted on the evidence
and material to the appeal, were in substance as follows:
The Northern Manufacturing Company proceeded to per-
form its contract according to the terms thereof. The ar-
chitect agreed upon to superintend and pass upon the work
as it proceeded was constantly present in the performance
of his duties during the time the building was being con-
structed. He changed the plans from time to time as he
was authorized to do, and the company was required to con-
form thereto. He permitted and sanctioned the use of other
building material in the building than such as was called
for by the specifications, particularly the use of flat-sawed
in place of quarter-sawed oak in the second and third stories.
The principal contractor greatly delayed the manufacturing
company in its work. Payments to the amount of $4,500
were made to the manufacturing company without any ar-

chitect's certificate or estimate. No such certificate, from first to last, was asked for, demanded, or required. The provisions of the contract in that regard were wholly ig-- nored and waived. The architect did not condemn any of the work or material in accordance with the terms of the contract. He refused to value the extras furnished under the manufacturing company contract or to submit the mat-- ter to arbitration as the contract provided. The manufact- uring company and its assignee, without the consent of the architect, neglected to perform the manufacturing com- pany contract in the following particulars: using flat-sawed oak in place of quarter-sawed oak in the first story; omit-- ting to do blind nailing at all points required; using some wood on the inside finish which was not thoroughly sea-- soned; and by inexcusable delay in the performance of the work for twenty-five days. The Northern Manufactur-- ing Company contract and the principal contract, on the whole, were substantially performed. In respect to those matters where there was a departure from strict perform- ance, liability for damages was incurred to the amount of $1,000, which should be allowed as a counterclaim to the amount of the claim of the assignee of such company, leav-- ing the balance due for work done under the contract, and for extras, $1,550.74. The claim of the *Ashland Lime, Salt & Cement Company* was originally $149, and should be re- duced by payments which were made thereon, to $124.34. The *Dullanty* contract for the plumbing work was substan- tially performed. The balance due him therefor, and for· extra work, is $971.84.

The referee's report was confirmed by the court, except· as to the amount found due *Dullanty* for the plumbing· work. That was reduced ten per cent. Judgment was ren- dered establishing the amount due from the principal con-- tractor as to each claimant, and in all other respects in. accordance with the statutes governing the subject. Ex--

ceptions were filed and preserved in the bill of exceptions so as to present the questions discussed in the opinion.

For the appellant there was a brief by *Cate, Sanborn, Lamoreux & Park*, and oral argument by *A. W. Sanborn*.

For the respondents there were separate briefs by *Ben S. Smith* as attorney for *Dixon* and as attorney for the *Ashland Lime, Salt & Cement Co.*, and a brief by *Lamoreux & Shea*, attorneys for *Dullanty*, and oral argument by *C. A. Lamoreux* and *Mr. Smith*.

MARSHALL, J. Appellant's counsel contend that the trial court erred in confirming the report of the referee as to the following: (1) That the principal contract was substantially performed; (2) that the contract with the Northern Manufacturing Company was substantially performed; (3) that the architect's certificate was waived; (4) that the damages to the principal contractor by failure of the Northern Manufacturing Company and its assignee to perform the subcontract were $1,000; (5) refusing to apply, on the claim of the *Ashland Lime, Salt & Cement Company*, payments made to such company by the principal contractor of moneys furnished such contractor by appellant, *Shores;* (6) the contract for the plumbing work by *Dullanty* was substantially performed.

1 and 2. The first two assignments of error can best be considered together. They are mainly ruled on the undisputed evidence by *Laycock v. Moon*, 97 Wis. 59, and *Laycock v. Parker*, 103 Wis. 161. The doctrine declared in those cases may be briefly stated thus: Where a building contract provides that the building shall be constructed according to certain plans and specifications to the satisfaction of the supervising architect, who shall inspect all material and work as the building is constructed, with power to reject any material or work not deemed by him to be in compliance with the contract, and to require unsatisfactory con-

structions to be removed and the work done over in a satisfactory manner, the manifest intent is that unsatisfactory material or.construction shall be promptly rejected, and that the architect shall not, by silence, allow unsatisfactory construction to proceed to a point where its removal from the building will be attended with serious loss to the builder, and then reject it; that a failure to reject material or work seasonably, and in the manner contemplated by the contract, operates as a waiver of defects in regard thereto and an irrevocable acceptance of such material or work as satisfactory under the contract, in the absence of some clear, unmistakable provision in such contract to the contrary. That is a reasonable and just doctrine to apply in cases like this. If the owner stipulates for inspection and approval of the work under a building contract as the building is constructed, and for a representative of his own to compel compliance with the contract at every step, if such representative fails to perform his duty the loss should fall on the owner of the building, and not be shifted to the builder, who may have been lured into the belief that his work and material were satisfactory till too late to remedy defects therein without serious loss. The owner should look to his architect. He should be, and is, bound the same as if he were upon the ground himself, charged with the duty of accepting or rejecting material or construction as soon as there is a reasonable opportunity for inspection of it. That is but an application of the elementary principle, that where property is delivered by one person to another, as fulfilling an executory contract between them requiring such delivery, and the latter neglects to notify the former that the property is not accepted as complying with the contract within a reasonable time after a fair opportunity to inspect it, an acceptance will be inferred. *Pratt v. Peck*, 70 Wis. 620; *Barton v. Kane*, 17 Wis. 37; *Locke v. Williamson*, 40 Wis. 377; *Olson v. Mayer*, 56 Wis. 551. What is a reasonable time for inspection and rejection.

must necessarily be governed by the nature of the contract and the consequences of delay, and all the circumstances. Under a building contract requiring constant presence and oversight of the work by a supervising architect, for the owner, for the very purpose of preventing any unsatisfactory material being wrought into the building or unsatisfactory construction remaining a part of it, a reasonable time in which to decide such matters is limited to a reasonable time for proper inspection. Any considerable delay in that regard must operate, by all equitable considerations, as an acceptance, except as to defects not discoverable by reasonable attention to the duties of inspection.

The foregoing is in accordance with authorities elsewhere. Wait, Engineering Jur. §§ 467, 468; *Wright v. Meyer*, 25 S. W. Rep. 1122; *Linch v. Paris, L. & G. E. Co.* 80 Tex. 23. In the latter case it was said that 'where the owner, under the provisions of a building contract, has a representative on the ground to inspect material and workmanship as operations progress, and with authority to reject any not deemed by him to be in accordance with such contract, and to compel a forfeiture of unsatisfactory work and its removal from the building and grounds, prompt action on the part of such architect is demanded, and any delay to the prejudice of a contractor will operate as a waiver of defects.' That is on all fours with the case before us. In *Wright v. Meyer* it is said, on the same subject, " When the architect is present and has knowledge of the character of material being placed in the improvement without objection at the time, his conduct is an approval of the same which cannot be revised by him to the prejudice of the contractor."

There is another significant feature about the contract under consideration. The progress certificates were not mere approximate estimates of the value of labor and materials wrought into the building during the previous months, which, under many authorities, are subject to subsequent

Ashland Lime, Salt & Cement Co. and others vs. Shores.

revision, leaving out the question of estoppel. By the terms of the contract the monthly estimates were confined to such parts of the building as had been constructed so as to satisfy the calls of the contract. Such certificates, without some clear saving clause, are conclusive in the absence of fraud or mistake. Hudson, Building Contracts, 285. Here there is a clause to the effect that no certificate, except the final certificate, shall be conclusive evidence of the acceptance of the contract, either in whole or in part, against any claim of the owner. That, however, must be considered, if possible, in connection with the previous clause confining progress certificates to satisfactory work, so as to make the two clauses consistent and give significance to each. That can only be done by holding that the latter clause was intended to limit the conclusive effect of progress certificates to patent defects, such as were discoverable by the exercise of ordinary care. That is a reasonable construction of the contract. Most of the defects complained of were of that character. The progress certificates show an acceptance of all the work done except about $600 out of $30,570, the total contract price and the value of all extras. The accepted work covered more than the original contract price by about $1,500.

A careful reading of the contract leads to the conclusion that the only final certificate contemplated by the parties was the last in the series of progress certificates. There is no call for a final certificate covering all the work. The only place a final certificate is mentioned is where it is said that no certificate except the final certificate shall be conclusive evidence of performance of the contract. Under such a contract the last progress certificate is to all intents and purposes the final certificate and the only final certificate that is required.

Now it is undisputed that the supervising architect, John W. Foster, did not, from the beginning to the end of the

Ashland Lime, Salt & Cement Co. and others vs. Shores.

work, require the removal of any material or work from the building in the manner provided for in the contract. There is evidence on his part that he made many complaints as to the character of the material being used, and that some of such complaints were heeded and some were not. It appears that the work generally met his approval as operations progressed; that it looked all right, but that defects developed afterwards, mainly caused by shrinking of the woodwork. It is not necessary to discuss the evidence in detail. It is sufficient to say that there is much evidence, direct and circumstantial, showing that, as a general thing, the material that was used in the building was acquiesced in both by the architect and the owner. On the whole we cannot discover any warrant for disturbing the finding in regard to the principal contract and principal subcontract having been substantially performed. The architect generally approved of both material and work, from the beginning to the end of the construction of the building, not only by failing to object, but by certifying in writing, in effect, by the progress certificates, as to the principal contract, that the work was done in compliance with the contract and satisfactory to him.

3. The contention that it was error to find that the architect's certificate of final completion of the work was waived can be disposed of in a few words. The finding complained of really refers to architect's certificates under the Northern Manufacturing Company contract. It appears from the evidence that, from the beginning to the end of the work under such contract, no such certificate was asked for or demanded by the principal contractor. Moreover the architect testified that he did not consider he had anything to do with the Northern Manufacturing Company except to see that the work performed by it was according to the contract between the principal contractor and the owner of the building. The right to an architect's certificate was not in-

sisted on as a justification or reason for not paying the sub-contractor, either before or after the action was brought. Neither in the answer of the principal contractor, nor that of the owner of the building, was want of an architect's certificate mentioned as a defense. Every circumstance appearing from the commencement of the operations under the subcontract down to the rendition of judgment in this case shows that its provisions in relation to architect's certificates were waived by the parties. The court was fully justified in so finding the fact to be. The circumstance of no objection being made to payment of the balance due because of the nonproduction of the architect's certificate of satisfactory completion of the work, alone, justifies finding the fact of waiver (*Davelaar v. Rockwell*, 35 Wis. 210), as does also the circumstance of making monthly payments under the contract to nearly the full amount of eighty-five per cent. of the contract price, without progress certificates being suggested or required. The first ground upon which the finding of the trial court may properly rest applies as well to the architect's certificates under the principal contract so far as material to this case. If a person, entitled to benefit by the provisions of a building contract relative to architect's certificates being a condition precedent to payment, desires to stand on the letter of such contract in that regard, he must not act inconsistent therewith till brought into court. Otherwise the doctrine of waiver will estop him from changing his position to the prejudice of his contractor. On this, and other questions under such contracts, entire harmony in judicial policy does not exist, but the doctrine of this court, indicated, is too firmly established to be questioned. It is well supported elsewhere, as we have seen. Wait, Engineering Jur. §§ 467, 468; *Vermont St. M. E. Church v. Brose*, 104 Ill. 206; *Dunabery & W. R. Co. v. Hopkins, G. & Co.* (1877), 36 Law T. (N. S.), 733; *Haden v. Coleman*, 73 N. Y. 567; *Summerlin v. Thompson*, 31 Fla. 369. Appel-

lant's counsel support the claim that there is no evidence that the architect's certificates were waived, by merely calling attention to the absence of direct evidence, overlooking the rule that the fact of waiver may be established by circumstantial as well as direct evidence, and that it is almost invariably established by the latter.

4. The next contention is that more than $1,000 should have been allowed against the Northern Manufacturing Company claim as damages for nonfulfillment of its contract. That is grounded on the following premises: (a) The contract was not substantially performed. (b) The measure of damages is the reasonable cost of making the work and material what the contract called for. (c) The delay in completing the contract, for which the subcontractor was liable to the extent of $5 a day, was at least 123 days.

(a) The question of substantial performance has already been discussed. The greater part of the defects upon which want of substantial performance is predicated by appellant's counsel were acquiesced in by the supervising architect as building operations progressed, as we have before seen. Such acquiescence, as indicated, precluded subsequent revision of the architect's judgment as to matters discoverable by ordinary attention to duty. The defects not covered by the implied approval were trifling as compared with those upon which the claim for damages is mainly based.

(b) The proper rule for measuring recoverable difference between substantial and complete performance of a building contract is not necessarily the cost of tearing down the defective work and rebuilding it so as to conform to the contract. It is the reasonable cost of remedying defects, so far as that can be done practicably, and the diminished value of the building so completed because of defects not so remediable. If a dwelling house were constructed with ceilings six inches lower than the plans called for, the recoverable loss would not be the cost of tearing down the structure and

rebuilding it according to the original design, but the diminished value of the house by reason of the departure from such design. *Arndt v. Keller*, 96 Wis. 274. As to any defect that may be suggested, if the cost of remedying it will exceed the diminished value of the structure in a material degree, the latter is the true measure of the liability of the builders.

(c) On the question of inexcusable delay in completing the contract, we are unable to agree that the evidence shows at least 123 days. True, the assignee testified that there was that much delay, but not of inexcusable delay. He claimed that most of it was chargeable to the fault of the architect and the principal contractor. The foreman of the work testified that, had it not been for such hindrances, and additions and alterations of the work as originally laid out, the contract would have been completed without material delay. There was considerable other evidence tending to show that most of the delay complained of was without fault on the part of the manufacturing company or its assignee. The proper allowance of time for excusable delay was a matter for the architect to pass upon, subject to appeal to arbitrators if the subcontractor desired. That part of the contract seems to have been ignored by the principal contractor and the architect. The latter testified, as before stated, that he did not understand he had anything to do as between the principal contractor and subcontractor. It further appears by the evidence that he refused to recognize his duties to decide matters of difference between the contractors. Thus it was left for the court to determine how many days' delay should be charged to the subcontractor. We cannot say that the result is contrary to the clear preponderance of the evidence. Delay caused by alterations in plans, or by conduct of the principal contractor, or any other subcontractor, or by inattention to duty on the part of the architect did not come under the penal clause of the contract. Wait,

Engineering Jur. §§ 324, 326, 552, 573, 577, and 585, and cases cited.

In view of what has been said we are unable to say the allowance of $1,000 damages on the manufacturing company contract was contrary to the clear preponderance of the evidence. The burden of proof was on the appellant to show the reasonable cost of remedying imperfections in the building which rendered performance of the contract substantial only, so far as such imperfections could be practically remedied, and the difference between the value of the structure so completed and what it would have been worth if the contract had been strictly followed. Little or no evidence was produced along that line. The proof on the part of appellant was made to satisfy an erroneous rule of damages,— the idea that the delinquent contractor was liable for the cost of removing all defective portions of the building and reconstructing such portions according to the contract. Such evidence was of no value in reaching a correct conclusion. Really, it is hard to see where the referee found any certain evidence to base a finding of damages upon, outside of the penalty of $5 a day for delay. That there were some defects for which the principal contractor was entitled to recover damages is quite clear, but we have looked in vain for proof in the record of how far such defects were remediable without unreasonable expenditure, and the reasonable cost thereof, and for proof of the difference between the value of the building, so completed, and its value constructed as the contract required. The decision assessing $1,000 as damages must have been the result of a mere guess or the application of an erroneous rule to the evidence, resulting in giving appellant the benefit of a greater recovery than she was entitled to on the evidence.

5. In respect to the contention that payments made by the principal contractor Foster to the *Ashland Lime, Salt & Cement Company,* out of money paid him by appellant,

*Shores*, were improperly applied to indebtedness of such contractor to such company for material that went into another building which such contractor had under construction during the time he was building the *Shores* residence, it is sufficient to say that the question involved was purely one of fact, and that no justification can be found in the record to warrant disturbing the decision of the trial court in regard to it, under the rule governing the subject.

6. There is left the contention that the decision as to substantial performance of the plumbing contract by *Dullanty* is contrary to the evidence. Most that was said in regard to the first two propositions applies to it. As between the principal contractor and the owner, the architect, either expressly or by his conduct, accepted substantially all of the work as it was done. *Dullanty*, who was a practical plumber of many years' experience, testified that he completed the job according to the plans and specifications, and in the best workmanlike manner as provided in his contract, except as to matters that were changed by the architect's orders or with his consent. One of the principal defects complained of was that the general character of the work was not first-class. Several witnesses testified in support of that theory, all, however, except the principal contractor and the architect, being persons accustomed to the ways of doing such work in large cities. One was from St. Paul and one from Milwaukee. The test of whether the general character of the work came up to the contract standard was, what was customarily considered first-class work in the locality where the contract was to be executed, in Ashland, Wisconsin. It is not improbable that such test differed materially from a Milwaukee or St. Paul test. That consideration probably had some weight in reaching the decision complained of. *Dullanty*, who had been engaged in the plumbing business in the city of Ashland for ten years, testified very explicitly, and in detail, that the work was first-class, as called for by

the contract. Coming down to the particular defects complained of, aside from the general character of the work, the architect, whose judgment was to govern under the contract, testified mainly as follows: The vent and revent pipes were not put in and extended to the top of the house, with expanders. The bath tubs were not finished on the outside as neat and smooth as they should have been. The closets were to be Wolf's Monogram and the contractor substituted others. The wash stands were not according to contract. The cover to the catch basin was not put on just right. The closets do not work perfectly, attributable, maybe, to the tanks not being high enough. The rough plumbing work was properly done, but the finished work was not as neat as it should be for open work. Some of the stubs of gas fixtures had to be changed. The lawn sprinkler was connected with the hot-water boiler. The bath tubs were raised a little from the floor so as to get the proper drainage to the lead pipe that conveyed water from them. The witness Koch testified to other matters, substantially all of which, however, occurred under the eye of the architect and without objection by him.

There is no dispute but that the entire plan of the plumbing work was carried out, except as to matters in regard to which the evidence is conflicting, and some trifling omissions, among them being two or three soap cups worth ten cents each, and the vent pipes with expanders, which could be put in at very small expense. As to the closets, *Dullanty* testified that a different kind than the specifications called for was put in by agreement with the architect, and that the same was true with reference to the wash basins. He further testified that the architect was present frequently during all the time the work was being done and that he found no fault with the work or material; that he, *Dullanty,* examined the gas pipes with the principal contractor after they were all in, and made every change suggested. There

are probably some matters in respect to which the plumbing contract was not strictly performed, but under all the circumstances we cannot say that the referee was not warranted in finding the fact of substantial performance and in not allowing any deduction for imperfections. There was no evidence produced as to the cost of remedying such defects as could be practicably remedied, and no evidence of the diminished value of the work as a whole by reason of defects that could not be so remedied. The modification of the referee's report, by charging *Dullanty* with damages to the amount of ten per cent. of his claim, seems to have been an arbitrary disturbance of the referee's decision. We are unable to find any basis for it in the evidence, in view of the law as to the proper rule of damages. The error in that, however, was in favor of the appellant, not against her.

There are other questions discussed in the briefs of counsel for appellant, but what has been said renders them immaterial.

*By the Court.*— The judgment of the circuit court is affirmed.